617 So.2d 1362 (1993)
Frankie J. LaFLEUR, etc., Plaintiffs-Appellees,
v.
Ola Mae GUILBEAU, et al., Defendants-Appellants.
No. 92-864.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1993.
*1364 Steven Gerald Durio, Jeffrey Ackermann, for Frankie J. LaFleur etc.
Joseph Michael Placer, Vincent Joseph Saitta, for Ola Mae Guilbeau.
Mark Seale, for St. Landry Bank of Eunice.
Before DOUCET, YELVERTON and COOKS, JJ.
YELVERTON, Judge.
In these two consolidated cases, the principal antagonists are the Guilbeaus, Ola and Kenneth, and the LaFleurs, Frankie J. and Ella Mae. The Guilbeaus are owners of 20% of the stock in a closely held corporation, Carencro Nursing Home, Inc. The corporation owns and runs Evangeline Oaks Guest House. The LaFleurs own 40% of the stock in the corporation. The remainder of the stock is divided up among 16 others. Mr. LaFleur is president, CEO, a member of the Board of Directors of the corporation, and also the administrator and consulting pharmacist for the nursing home.
The thrust of both lawsuits is an effort by the Guilbeaus, minority shareholders, to rectify what they claim amounts to an abuse of minority shareholders' rights by the majority. To accomplish the relief they sought, the LaFleurs asked for an injunction, a receivership, and alternatively, a dissolution of the corporation. After conducting a 16-day trial, hearing 26 witnesses and reviewing numerous documents, the trial judge, for written reasons assigned, rejected all of the Guilbeaus' demands, and dismissed both suits. The LaFleurs appealed. We affirm.
The following reasons for judgment apply to both appeals. A separate judgment will this date be handed down in the companion case of Guilbeau v. LaFleur, 617 So.2d 1373 (La.App. 3d Cir.1993).

HISTORY AND BASIC FACTS IN CONTROVERSY
Carencro Nursing Home, Inc., was incorporated in Lafayette Parish in 1982. Its purpose was to operate a health care facility. Frankie LaFleur owned a drugstore, Bechet's. His wife Ella Mae was a registered nurse. The LaFleurs obtained a Certificate of Need from the State of Louisiana for the establishment of a nursing home. The Guilbeaus owned seven-and-a-half acres of land in Carencro. Pooling these resources, the LaFleurs and the Guilbeaus agreed to incorporate for the establishment of a nursing home, to be named Evangeline Oaks Guest House, on the land. One hundred shares of stock were issued. The incorporators, Frankie and Ella Mae LaFleur, received 45 shares. In exchange for their seven-and-a-half acres of land, the *1365 Guilbeaus received 20 shares. The remaining 35 shares were purchased by others.
The shareholders, including the LaFleurs and Guilbeaus, entered into a shareholders agreement in early 1983. The agreement recognized the contributions of the LaFleurs: the Certificate of Need, and all of their title and interest in Bechet's Pharmacy. The articles of incorporation, as well as the shareholders agreement, provided that the first directors of the corporation would consist of four people, the Guilbeaus and the LaFleurs. These documents also permitted the reduction of the Board to no less than three and the increase of the Board of Directors to not more than fifteen. Several other provisions were put in the shareholders agreement. One was that Frankie LaFleur would be the operator of the nursing home and its director, at a beginning salary of $2,500 per month, while Ella Mae would be the director of nursing for a beginning salary of $1,900 per month. Their salaries could be increased by the approval of 81% of the directors of the corporation.
Certain provisions were made to enhance the voting power of the Guilbeaus. The shareholders agreement provided that 75% of the positive cash flow would be distributed to the shareholders each year, and that any major changes in this percentage of distribution required the action of 81% of the holders of shares.
In addition to the 81% requirement for the Board of Directors to increase salaries, it also took 81% of the Board of Directors to increase or decrease the number of directors. This rule was subject, however, to change by the by-laws, which in turn was controlled by a majority of shareholders. An affirmative vote of 81% of the number of shares entitled to vote was required for amendment of the articles of incorporation, and amendment of the shareholders agreement, or merger, or consolidation.
Another provision of the shareholders agreement and by-laws was that checks written by the corporation in excess of $5,000 required the signature of one LaFleur and one Guilbeau. Checks written for less than $5,000 required the signature of only a LaFleur.
The number of shares belonging to the Guilbeaus has always remained at 20. Fred Guilbeau died in 1986 and his son, Kenneth, took his place on the Board of Directors. Ola donated four of her shares to Kenneth.
The LaFleurs, starting with 45 shares, reduced their number to 33 when they gave four shares to each of their three adult children. The LaFleurs later bought an additional 13 shares to increase their shares to the number of 46.
The nursing home opened in 1984. It has been highly successful financially. Its 152 beds have always been occupied. In the five year period between 1985 and 1990 its net income before taxes rose steadily to nearly $500,000. Its per day cost of operation was lower than the average and lower than any state reimbursed nursing home. Although the salary of LaFleur, as head of the facility, had increased somewhat, it still remained below the average.
The trial judge observed in his reasons for judgment that the nursing home was a profitable corporation with dividends being paid to the Guilbeaus in excess of $200,000. In denying the Guilbeaus any of the relief prayed for, the trial court found no mismanagement, and no abuse of minority shareholders' rights such as to warrant judicial interference. The court's findings of fact on which its conclusions were based are subject to the manifest error standard of review.
The litigation between the parties began following a Board of Directors meeting which was held on September 29, 1986. By the date of this meeting the number of the Board of Directors had increased to six. Fred Guilbeau was deceased, and at the meeting his son, Kenneth, was voted in as a member of the Board, thus increasing the Board size to seven. At this meeting it became apparent that a move was afoot to fire Mr. LaFleur. This prompted the LaFleur suit, the first action herein, for a temporary restraining order and temporary receivership. Both were granted by the trial judge.
*1366 While in receivership, a special meeting of the shareholders was held. Fifty-seven percent of the shares voted to replace three of the existing directors with the three LaFleur children.
The parties compromised that lawsuit on March 4, 1987. This compromise did not dismiss the receivership proceeding, but it did constitute a waiver by all parties of the right to pursue damages as a result of any action prior to that time.
At the annual shareholders meeting for 1987, held on March 23, the shareholders reduced the number of directors to six. Kenneth Guilbeau was not re-elected.
In October 1987, the Guilbeaus filed their suit, the second action herein, which was later tried and dismissed, and which is the main subject of this appeal.
On appeal the Guilbeaus raise several assignments of error. They allege that the trial court erred in failing to grant an injunction and order a receivership, or grant dissolution of the corporation. In support of a receivership, they argue six specific acts of mismanagement. They complained that it was error of the trial court not to find that an attorney, Frank McGee, had engaged in a conspiracy with the LaFleurs to gain total dominion and control of the corporation. Finally, they say it was error not to grant declaratory relief on the question of termination of Mr. LaFleur as administrator.
We will now discuss these specific assignments of error.

INJUNCTION
An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant. La. C.C.P. art. 3601.
The Guilbeaus asked for an injunction so that the parties could be placed back in the position originally contemplated by the shareholders agreement, articles of incorporation, and by-laws.
The trial court, citing Town of Kinder v. Beauregard Electric Co-op, Inc., 339 So.2d 891 (La.App. 3d Cir.1976), denied injunctive relief, finding that there was nothing to enjoin as of the date of the trial. The Guilbeaus sought to enjoin acts which had already happened: Kenneth Guilbeau's removal from the Board; the LaFleur children's election to the Board; the matter of Ms. Guilbeau's not having signed checks over $5,000 as provided in the shareholders agreement; the refusal of Frank McGee to allow a vote of the Board of Directors to terminate Mr. LaFleur as administrator; and the increase in the salary of the LaFleurs.
All these acts occurred before trial, so we find that the trial court was correct in denying injunctive relief. The proper determination is whether a receivership or dissolution was an appropriate remedy considering these allegations and the evidence.

RECEIVERSHIP
The appointment of a receiver is governed by La.R.S. 12:151. Gross mismanagement is a ground. Another is the violation of the rights of minority shareholders. The Guilbeaus argued that the LaFleurs grossly mismanaged the business, committing gross and persistent ultra vires acts and wasting, misusing and misapplying the assets of the corporation. They contended that the LaFleurs as majority shareholders violated the rights of the minority shareholders and endangered their interests. They based their allegations on several actions which they claimed were examples of the mismanagement and ultra vires acts. We will discuss these allegations shortly.
The appointment of a receiver for a corporation is not mandatory but is subject to sound judicial discretion. A court will order the appointment of a receiver for a corporation only when it is manifest that the appointment should be made, in absence of a clear showing of fraud or breach of trust. Courts, in determining whether to appoint a receiver for a corporation, are influenced by the consideration whether such action will serve a useful purpose. The reviewing court will not disturb a trial judge's refusal to appoint a receiver for a corporation, except where it clearly appears that the interest of the minority *1367 shareholders are in imminent danger, particularly where they have a full and adequate remedy through other means. The remedy of receivership of a corporation looks only to the prevention of future grievances. Coleman v. La Salle Creosoting Company, 129 So.2d 311 (La.App. 3d Cir.1961); Fincher v. Claiborne Butane Co., Inc., 349 So.2d 1014 (La.App.2d Cir. 1977); Allen v. Royale 16, Inc., 449 So.2d 1365 (La.App. 4th Cir.1984).
Before discussing the specific allegations of mismanagement, we need to consider a couple of evidence questions.
The Guilbeaus complain that the trial court erred in failing to consider acts of mismanagement occurring prior to March 4, 1987. Prior to trial, the defendants filed a motion in limine asking the court to preclude any evidence of acts on the part of defendants which took place prior to March 4, 1987. The trial court granted this motion based on a joint stipulation entered into by the parties on March 4, 1987. Prior to trial, the trial court reconsidered the motion and denied it. Evidence was introduced in the 16 days of testimony of acts occurring prior to March 4, 1987. Then, in its reasons for judgment, the trial court declared that it would only consider acts of mismanagement occurring subsequent to March 4, 1987 due to the joint stipulation entered into by the parties.
After a review of the stipulation entered into by the parties on March 4, 1987, we find that the parties stipulated that none of the parties could introduce evidence of acts occurring before March 4, 1987 for the purpose of damages. There was no stipulation as to evidence for the purposes of a receivership or dissolution. We find that it is proper for the purposes of this suit that all alleged acts of mismanagement be considered since there has been no stipulation or judgment based on actions before March 4, 1987. Since evidence of acts occurring before March 4, 1987 was introduced, we will make a de novo review of this evidence for the purposes of determining whether the trial court erred in not ordering a receivership or dissolution.
The other evidence question is presented by the Guilbeaus' claim that the trial court should have allowed their expert to testify regarding damage caused by the failure to expand the corporation. The trial court would not allow the testimony believing it to be irrelevant to the issue of whether the corporation was being grossly mismanaged. The testimony was then offered under proffer. We agree with the trial judge that this was irrelevant evidence.
La.C.E. art. 401 defines relevant evidence as evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Whether the nursing home should have been expanded or not was a business decision that was not determinative of how well the corporation was being managed. It was also very speculative evidence. It does not follow that because the corporation did not expand, it was being mismanaged. The trial court was correct in denying the admission of expert testimony on whether the nursing home should have been expanded.
There were six specific alleged acts of mismanagement. We designate them by the numerals one through six, as follows.

1. Vote of Shareholders

The Guilbeaus first claimed that the 81% "super majority" vote in the shareholders agreement was a "checks and balances" and veto power provision since the Guilbeaus owned 20 of the 100 shares of stock. They contended that the acquisition of a majority of the shares by the LaFleur family unfairly upset this balance. We agree with the trial judge that there simply is no merit to this argument. The Guilbeaus still own 20 shares of stock; Ms. Guilbeau controls 6 shares of her own and 10 shares of her late husband's estate and Kenneth controls 4 shares donated to him by his mother. Also, when some of the shareholders offered their stock for sale, the Guilbeaus were given the opportunity to purchase the stock as provided in the *1368 articles of incorporation. They chose not to exercise that option. The LaFleurs took the opportunity to become majority shareholders.
This was not an act of mismanagement but the seizing of an opportunity that was offered to all shareholders.

2. Reduction of Board

The Guilbeaus also complained about the reduction of the Board to six members and the placement of the LaFleur children on the Board. They allege that due to the four-share-ownership requirement to be on the Board, only seven shareholders were eligible for that position which were the LaFleurs, the LaFleur children, and Ola and Kenneth Guilbeau. Kenneth had been appointed to fill the vacancy left by his father at the September 29, 1986, Board of Directors meeting.
The LaFleur children were elected at a specially called shareholders meeting on October 20, 1086. They filled the vacancies created by Reginald Zaunbrecher, Lloyd Leonard, and Lee LaFleur.
The motion to elect six members to the Board was made and approved at the March 23, 1987 annual shareholders meeting. The LaFleurs, the LaFleur children and Ms. Guilbeau were elected to fill the six vacancies.
The Guilbeaus believed that the articles of incorporation limited the means by which the size of the Board could be decreased to a vote of 81% of the directors. That is not so. The shareholders, through the by-laws, also had this authority.
Article V, Section A, of the articles of incorporation states:
A. Unless and until otherwise provided in the By-Laws, all of the corporate powers of this corporation shall be vested in, and all of the business and affairs of this corporation shall be managed by, a board of not less than 3 nor more than 15 directors. The number of directors may be increased or decreased within the limits above provided by a vote of at least 81% of the directors.
The trial court correctly interpreted the above provision to reflect that the majority of the shareholders had the power to amend the by-laws to change the number on the Board. The trial court noted from the evidence that the corporation historically conducted its Board elections in the same manner, sometimes increasing, sometimes decreasing, the number of the Board. Unquestionably, the shareholders had the authority to amend the by-laws to accomplish the very thing that they accomplished at their annual meetings in the election of directors. A federal district court in Nowling v. Aero Services Intern., Inc., 734 F.Supp. 733 (E.D.La.1990) recognized a situation where shareholder action was implicitly an amendment of the by-laws to permit such action. We are persuaded by the reasoning of that case that this is the law of Louisiana. We agree with the trial court's finding that the by-laws were amended by implication by a shareholders vote to allow the reduction of the number of directors.

3. Salary Increases

The Guilbeaus also complained about the increase in the salaries of the LaFleurs, and that Mr. LaFleur received an additional salary for his position as pharmacy consultant.
The salaries of the LaFleurs were increased at the May 26, 1987, Board of Directors meeting. A representative of a CPA firm which performed work for the nursing home, presented information regarding the salaries of administrators and directors of nursing at other nursing homes with which that firm was involved and had knowledge. Mr. LaFleur received a raise and his salary was increased to $42,000. The raise in 1987 was the first raise that the LaFleurs had received since the nursing home opened.
The shareholders agreement provided that Mr. LaFleur would receive a salary of $2,500 a month commencing October 1, 1982, and Mrs. LaFleur would receive a salary of $1,900 a month commencing when her services were required. It also provided that these salaries could be reviewed on *1369 a semiannual basis and increased upon the approval of 81% of the directors. Under the agreement, a salary increase could not unreasonably be withheld and was to be commensurate with others in similar positions.
Lawrence Kramer, a CPA with Broussard, Lewis and Breaux, testified at trial regarding the salaries of the LaFleurs. This firm also audited the nursing home and had done so since 1984. In comparing the nursing homes he used cost reports submitted to the State and information from the Louisiana Nursing Home Association. One of the ways he compared costs of the nursing homes was the use of a per patient day analysis. He stated that this put the nursing homes on equal footing. He also testified that just using a flat salary did not give any consideration to the differing sizes of the homes and the other costs that were associated with the administrator that might be costed out on other lines of the cost report. He used various ways to analyze the salaries.
His testimony revealed that considering Mr. LaFleur's new salary of $42,000, the Evangeline Oaks' administrator salary was $.79 on a per patient day basis in 1990 compared to $1.05 a day for the average of the other nursing homes for that year. A per patient day analysis took into account the number of beds and occupancy rate of a home.
The same analysis was used for the salary of the director of nursing. Ms. LaFleur's salary was much lower than the average salary in comparison with other homes. In October 1990, a new director of nursing was hired at a salary of $33,000 a year.
The trial court accepted the expert testimony of Mr. Kramer and found that it was not unreasonable to increase the LaFleurs' salaries. There was no error in this finding of fact.

4. Misappropriation of Funds

The Guilbeaus complained that Mr. LaFleur was paying his personal financial obligations with funds belonging to the nursing home in early 1984. The trial court did not consider this issue. We will.
The LaFleurs transferred their pharmacy, Bechet's, into the nursing home. The transfer was supposed to take effect when the nursing home was operational which was in 1985. In March 1984, Bechet's was transferred to the nursing home and the transfer was made retroactive to the first of the year for tax purposes. Mr. LaFleur had some personal drafts which were automatically deducted from the accounts at Bechet's. There were also some personal notes that were transferred with Bechet's. The drafts were deducted in January-March when the LaFleurs still owned Bechet's before the retroactive transfer. This was explained at the Board meeting June 19, 1984. A letter, written in August 1984 by the first CPA firm that performed work for the nursing home, verified that Mr. LaFleur reimbursed the nursing home for these personal drafts. Steven Ortego, a CPA with this firm testified that these problems were caused by the retroactive transfer of Bechet's and that the problem was corrected. We conclude that this was not mismanagement but a mistake caused by the retroactive transfer of Bechet's.
The Guilbeaus also complained that Ms. Guilbeau had not been allowed to sign checks for $5,000 and above, as provided by the shareholders agreement. The trial judge discussed this issue and found that, although the Guilbeaus did not always sign these checks, there was no evidence of mismanagement.
The shareholders agreement provided that all checks written by the corporation in excess of $5,000 in amount required the signature of one of either Frankie or Ella Mae LaFleur and one of either Fred or Ola Guilbeau. Checks written for less than $5,000 or for the monthly mortgage payment for the nursing home building and equipment, need only be signed by Frankie or Ella Mae LaFleur.
Mr. LaFleur testified that he did not think that checks over $5,000 for staple items needed to be sent to Ms. Guilbeau for her signature. He labeled utilities, transfers, notes, taxes, and others that were *1370 paid on a monthly basis as staple items. He said he sent checks for insurance and a large item like equipment over to Ms. Guilbeau for her signature. He also said that Ms. Guilbeau had never complained about not signing the checks until just before the trial, and that when she complained he began sending everything over $5,000 to her.
Joycelyn Babineaux, the dietary manager at the nursing home, testified that the normal day to day operations, like the food expense, required only one signature, but special purchases over $5,000 required two signatures. William Hudson stated that when he was receiver Ms. Guilbeau never complained to him that she was not signing checks over $5,000.
The shareholders agreement required the signature of Ms. Guilbeau and one of the LaFleurs for items over $5,000, unless it was a mortgage payment or for the building or equipment. Mr. LaFleur misunderstood, thinking that he had to present checks only for extraordinary items over $5,000 and not checks for the normal day to day items. After he was put on notice, he stated that he began presenting these checks to Ms. Guilbeau for signature. He testified that there was no further problem with check signing.
The Guilbeaus also complained that the nursing home paid for a feasibility study of the purchase of another nursing home which was prepared for Mr. LaFleur personally. The Carencro nursing home had been billed $900 for nursing home projections.
At the Board meeting on February 29, 1988, Ms. Vidrine explained to the Board that the CPA firm had erroneously billed the nursing home for the projections when they should have billed Mr. LaFleur personally as he requested. She further explained that Mr. LaFleur reimbursed the corporation for the expense.
The trial judge evidently concluded that this was an error caused by the CPA firm and not any mismanagement on Mr. LaFleur's part. We agree.

5. Ownership of Homes for the Mentally Handicapped

The Guilbeaus also complained that the LaFleurs had usurped a corporate opportunity by owning and operating Liberty Six Community Homes, Inc. This was a corporation that owned and operated four residential homes for mentally handicapped adults. The Guilbeaus also charged that the LaFleur children were shareholders in Liberty Six, and that this was in violation of the shareholders agreement which provided that no person, except the LaFleurs or the Guilbeaus, who was an owner or part-owner of four or more health care facilities, could be a shareholder, officer or director of Carencro Nursing Home, Inc.
Mr. LaFleur testified regarding the ownership in Liberty Six. He stated that his children owned no stock in Liberty Six. A cost report was introduced which showed that each of the LaFleur children owned 1% of the stock. Mr. LaFleur explained that that was originally contemplated but that the children never got the stock. Mr. McGee also testified with regard to the ownership in Liberty Six. He stated that he prepared the stock book for Liberty Six and the elder LaFleurs were the only people who owned stock in the corporation.
Mr. LaFleur also explained that the community homes were a teaching institution rather than a health care institution. Ms. Guilbeau's own testimony regarding expansion of the nursing home contemplated the addition of a wing and duplication of the existing facility on three more acres, and not the branching out into other endeavors.
Investing in mentally handicapped community homes does not appear to have been the usurpation of a corporate opportunity. These homes are different from nursing homes and not in competition with them. The evidence indicates that expansion for Carencro Nursing Home, Inc., would take the form of adding more beds or building another nursing home. We also find that there was not sufficient evidence to prove that the LaFleur children owned any stock in Liberty Six.

*1371 6. Destruction of Drugs

The Guilbeaus claimed that, as evidence of another act of mismanagement, Mr. LaFleur was not destroying drugs and was re-using them, a practice prohibited by the State.
On July 26, 1984, the State of Louisiana Board of Examiners for Nursing Home Administrators received a call from Muriel Bates, who was a preceptor for Mr. LaFleur. She told the State that Mr. LaFleur was not destroying discontinued drugs.
There was an investigation by D.H.H.R. Ms. Bates did not know the results of the investigation. The testimony of Mr. LaFleur was that in 1986 the State reviewed the situation and the way the narcotics were stored, and that the nursing home was never cited for violations. We find no error in the trial court's dismissal of this alleged mismanagement as unproved.
To rebut the above six claims of mismanagement and the evidence offered by the Guilbeaus, the LaFleurs put on considerable evidence that the corporation was solvent and well managed. Ms. Vidrine testified that while she worked as a CPA for the nursing home she saw no mismanagement and no misuse of corporate funds by Mr. LaFleur. She thought that it was a well managed facility. Another CPA, Mr. Kramer, testified that the nursing home was doing well financially due to its management and the fact that it was kept at full capacity. He stated that it had experienced an increase in profits yearly, and was expected to continue that way as long as the State reimbursement rate continued to be good. This nursing home was the only one that the CPA serviced that did an annual audit.
Several of the shareholders and former directors also were happy with the corporation's management, and so testified. Freddie Mouton, a shareholder, stated that it was very important to him that Mr. LaFleur stay on as administrator because he had been doing a good job. He also felt that Ms. LaFleur was doing a good job. Mr. Mouton stated that he was getting a 33% per year return on his investment and that his stock has doubled in value. Mr. Leonard did not feel that Mr. LaFleur was hiding anything from him. He also stated that he had at one point been willing to fire Mr. LaFleur because Ms. Guilbeau told him that Mr. LaFleur was not doing his job, but that he did not verify if this was true or not. He changed his mind when he discovered it was not true. Mr. Zaunbrecher was willing to fire Mr. LaFleur to keep peace on the Board and get an administrator who was not a member of the Board. He never thought Mr. LaFleur had done anything improper. He felt that Mr. LaFleur let them know what was going on. He trusted him and was happy with his investment.
Mr. Hudson, the temporary receiver, stated that he thought the corporation was in good shape when the receivership was lifted. He thought that questions asked had been reasonably answered by management. He was also satisfied that the corporation was well run. Also, at a meeting conducted by Mr. Hudson on October 14, 1986, Ms. Guilbeau had no objections to the day to day operations of the nursing home and Mr. LaFleur was authorized to continue as administrator.
We agree with the trial court's assessment of this situation as one in which there was a power struggle for the control of the corporation between the LaFleurs and the Guilbeaus. The LaFleurs followed the rules set forth in the corporate documents and through business maneuvering gained control of over 50% of the stock. However, the Guilbeaus still control 20% of the stock and their vote is still needed, as it always has been, in order to exercise certain corporate decisions. The facts do not demonstrate that there has been willful mismanagement having a purpose to ruin the corporation and dissipate its assets. On the contrary, the corporation has continued to increase in its profits each year and most of the other minority shareholders appear to be totally happy with their investment.
The trial judge did not abuse his discretion in refusing to order a receivership.

INVOLUNTARY DISSOLUTION
In the alternative, the Guilbeaus have asked for an involuntary dissolution pursuant to La.R.S. 12:143.
*1372 The drastic remedy of involuntary dissolution of a corporation is reluctantly applied, and the statutory grounds are limited and specific. Allen v. Royale "16", Inc., supra. Since no grounds exist in the present case to justify the appointment of a receiver for the corporation, certainly there are no grounds for an involuntary dissolution.

CONSPIRACY INVOLVING ATTORNEY
The Guilbeaus claim that the trial court erred in failing to find that Frank McGee, as attorney for the corporation (and also a defendant in the Guilbeau suit), helped the LaFleurs gain control of the corporation, thereby destroying minority shareholders' rights. The trial judge found no credible evidence to prove any type of conspiracy or wrongdoing on the part of Mr. McGee.
Mr. McGee first became involved with the corporation in connection with his representation of a client, Lee LaFleur (not related to the principal LaFleurs in this case). His client had purchased stock in the corporation and was on the Board. Lee went to Mr. McGee for advice. The other directors also started looking to Mr. McGee for advice. After a suggestion to Mr. LaFleur, Mr. McGee began presiding as chairman of the Board meetings and taking minutes to help diffuse the ongoing friction between the LaFleurs and Guilbeaus. Mr. McGee eventually became corporate counsel at the July 15, 1985, Board meeting. It was Ms. Guilbeau who made the motion that he be named corporate counsel. As a matter of fact, the LaFleurs were the only ones who voted against him becoming corporate counsel.
Only twice did Mr. McGee represent the LaFleurs personally. Once was when Mr. LaFleur was involved in an automobile accident while on business for the corporation. The other time Mr. McGee prepared a power of attorney for Mr. LaFleur.
Mr. McGee advised Mr. LaFleur about the process he had to go through in order to obtain 51% of the stock. This was after Mr. LaFleur questioned him saying he wanted to have more input on who was elected on the Board.
Mr. McGee would not allow the motion to terminate Mr. LaFleur as administrator because he did not feel the motion was proper. It was not on the agenda and the corporate documents did not allow for the termination of Mr. LaFleur under these circumstances. He felt if he allowed the motion to be pursued, the corporation might be sued. He did allow the minutes to show a straw vote to terminate Mr. LaFleur. The advice Mr. McGee gave was not the first time the directors had been so advised. The first attorney for the corporation, Kenneth Pitre, had advised the Board at a meeting on February 18, 1985 that the LaFleurs could not be removed without the shareholders amending the shareholders agreement.
Mr. Leonard did not feel that Mr. McGee had done anything improper and supported him in everything he did at the meetings. Mr. Zaunbrecher felt that Mr. McGee treated Ms. Guilbeau fairly. Mr. Mouton also felt that when Mr. McGee started presiding at the shareholders meetings, he did a fine job and they could get more done with him. He also felt he treated Ms. Guilbeau fairly.
There was no evidence that Mr. McGee was involved in a conspiracy with the LaFleurs to help them gain control of the corporation. Mr. McGee represented the corporation and looked out for its best interests. Other shareholders had no problem with the way he handled the corporate affairs. The trial court did not err in its finding that there was no credible evidence to prove any type of conspiracy or wrongdoing on the part of Mr. McGee.

DECLARATORY JUDGMENT
The Guilbeaus claim the trial court erred in failing to grant declaratory relief on the question of the termination of Mr. LaFleur in his position as administrator of the nursing home. The trial court found that the request for a declaratory judgment was moot.
At the Board meeting of September 29, 1986, Mr. Seale made a motion to terminate Mr. LaFleur as administrator of the nursing *1373 home. This motion was seconded by Ms. Guilbeau. Mr. McGee refused to accept the motion for the reasons above stated. Mr. McGee advised the Board that it could call a special meeting to vote to amend the by-laws but that agenda items needed 72 hours notice. Subsequently, a temporary restraining order was issued and the corporation was placed in temporary receivership.
We agree with the trial judge that the rendition of a La.C.C.P. art. 1871 declaratory judgment is moot since the administrator was not fired then and no attempt is pending to fire him now. Most of those who had been persuaded to vote for termination on September 29, 1986, subsequently changed their minds.
We also find that due to the findings by this court, the Guilbeaus are not entitled to damages.
For the reasons above assigned, we affirm the judgment of the trial court. The appellants, Ola Mae Guilbeau and Kenneth Guilbeau, are cast with the costs of this appeal.
AFFIRMED.