STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 04-130


THE CARMOUCHE LAW FIRM, APLC

VERSUS

SCOTT J. PIAS


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 99-4346
HONORABLE DAVID PAINTER, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Oswald A. Decuir, and Glenn B. Gremillion, Judges.

**AFFIRMED IN PART; REVERSED IN PART;**
**AND REMANDED.**

William Joseph Mize
Robicheaux, Mize & Wadsack
P. O. Drawer 2065
Lake Charles, LA 70602
(337) 433-0234
Counsel for: Plaintiff/Appellee
        William Joseph Mize
        John Frederick Wadsack
        John F. Robicheaux


Gerald Joseph Casey
Attorney at Law

**3101 Lake St.**
**Lake Charles, LA 70601**
**(337) 474-5005**
**Counsel for: Plaintiff/Appellee**
  **William Joseph Mize**
  **John Frederick Wadsack**
  **David Ross Frohn**
  **Terry Thibodeaux**
  **The Carmouche Law Firm, APLC**
  **John F. Robicheaux**

**Kathleen Kay**
**Attorney at Law**
**P. O. Box 2042**
**Lake Charles, LA 70602-2042**
**(337) 439-7616**
**Counsel for: Defendant/Appellant**
  **Scott James Pias**

**Leslie Qvale Knox**
**Attorney at Law**
**P. O. Box 2266**
**Lake Charles, LA 70602-2266**
**(337) 990-0015**
**Counsel for: Plaintiff/Appellee**
  **The Carmouche Law Firm, APLC**

**SAUNDERS, Judge.**

Plaintiffs and defendant appeal the judgment of the trial court awarding Scott Pias $38,234.50, for termination without cause by The Carmouche Law Firm ("TCLF") and payment for work performed for the firm from October 1, 1996 to December 6, 1996, and awarding TCLF $6,102.02 based on the calculation found in a Shareholders Agreement addressing the redemption of shares upon a shareholder's termination. TCLF also appeals the trial court's decision to appoint a liquidator to facilitate the dissolution of TCLF. For the reasons stated below we affirm in part, reverse in part, and remand.

## FACTS

The TCLF, is a professional law corporation formed in April of 1990. As of January of 1996, the shareholders/directors of the firm were Joseph A. Delafield, David, R Frohn, W. Joseph Mize, Scott J. Pias, John F. Robichaux, Terry Thibodeaux, and John F Wadsack. On February 14, 1996, all shareholders of the firm signed a Shareholders Agreement, effective as of October 1, 1995, which forms the basis for this suit. Additionally, all shareholders also signed an Employment Agreement, also effective October 1, 1995.

In the Spring of 1996, Delafield and Pias accepted representation of Crane Ceaux. During the course of that litigation, Delafield and Pias were cited for contempt by the presiding judge. Marty Stroud was retained to represent Delafield and Pias in this contempt proceeding, with an agreement among all shareholders of TCLF that the firm would pay all legal bills for his representation of Delafield and Pias in the contempt proceeding.

In late September 1996, during the pendency of the contempt proceeding, Delafield and Pias traveled to Chicago to attend the National Bond Lawyers

Association annual meeting. While at this conference, the attorney for the Fourteenth Judicial District Court presented a letter for Delafield and Pias to sign. The letter was not presented during this trial, and the actual contents of it are the subject of much dispute. It is alleged by Pias that it contained an admission of guilt as to the contempt charge, and a formal apology. Pias and Delafield were contacted in Chicago by Mize to discuss the letter, its contents, and whether they would agree to sign. Believing the letter contained an admission of guilt, Pias and Delafield both refused to sign the letter.

The actual chain of events following the phone conversations between Mize and Pias and Mize and Delafield are intensely contested. Pias and Delafield both allege that they were told they must sign the letter or the firm would refuse to pay Stroud's attorney fees on their behalf and they would be asked to leave the firm. Frohn, Mize, Robichaux, Thibodeaux, and Wadsack deny that there was ever any mention of termination during this discussion, or after Pias and Delefield returned from the conference. Pias and Delefield eventually resolved the contempt issue by signing a different letter of apology, and Stroud's legal fees were eventually paid by the firm. Pias remained at TCLF wrapping up his files until December 6, 1996. The firm continued the practice of law until January of 1998, at which time Delafield tendered his resignation and the remaining members split and formed two new law firms, Frohn &Thibodeaux and Robicheaux, Mize & Wadsack . Delafield, Frohn &Thibodeaux, and Robicheaux, Mize & Wadsack all continued to occupy the physical space which had been leased by TCLF.

Following Pias' departure, Robicheaux wrote a letter to Pias advising him that, based upon the withdrawal formula contained within the Shareholders Agreement, Pias owed the firm $49,552.87, payable in thirty-six monthly installments. The

2

Shareholders Agreement, signed by all shareholder/directors of the firm on February 14, 1996, contains the following provision for redemption of shares upon a shareholder's termination:

> 1.1 <u>Withdrawal</u>. Should a shareholder's employment with the Corporation terminate for any reason other than the shareholder's permanent disability or retirement (both as described below) or death, the Corporation shall redeem the entirety of its common stock held by that shareholder for a redemption price equal to that shareholder's proportionate share (determined by dividing the number of shares of stock of the Corporation outstanding on such date) of the outstanding stock of the corporation (Capital Percentage) as of the beginning of the fiscal year in which that shareholder's termination of employment is effective, times eighty percent (80%) of the invoiced and unpaid fee and expense accounts receivable of Corporation, that are 120 or less days old and reasonably determined by the Corporation to be collectible, as of the effective date of withdrawal; plus the shareholder's capital percentage times a sum equal to six (6) times the average monthly net earnings of the Corporation for the twelve (12) consecutive calendar months immediately preceding the calendar month of the effective date of withdrawal; less the shareholder's capital percentage times the total outstanding indebtedness of the Corporation on the following obligations: [1] First National Bank Long Term Loan; [2] First National Bank Line of Credit Loan; [3] Building Space Lease with Premier Bank; [4] Notes payable to shareholders; and [5] accounts payable.

In June of 1999, following Pias' refusal to pay, TCLF filed a Petition for Money Judgment. Pias filed an exception claiming non-joinder of indispensable parties, seeking to have the other shareholders/directors joined as parties to the lawsuit. The trial court sustained the objection and ordered that Robichaux, Mize, Frohn, Thibodeaux, and Wadsack be made parties to the lawsuit. In June of 2001 Pias filed an Answer to Plaintiff's Petition for Money Judgment and First Supplemental and Amending Petition and Reconventional Demand. In his reconventional demand Pias sought damages specified under his employment contract for termination without cause. In addition, Pias requested the appointment of a liquidator pursuant to La.R.S. 12:143. Trial on the merits was held May 12 and 13, 2003.

The trial court issued Written Reasons for Judgment on June 6, 2003. The court

held that Pias owed TCLF $6,102.02 under the terms of the Shareholders Agreement. The court also held that Pias was terminated by TCLF without cause and awarded him $25,546.50 under the terms of his Employment Agreement, and $12,688.00 for work he performed for the firm between October 1, 1996, and December 6, 1996. Finally, the trial court appointed a liquidator as requested by Pias to force the dissolution of TCLF, which the trial court found was no longer operational. On August 28, 2003, the trial court entered a money judgment in favor of Pias in the amount of $31,264.76 and appointed Leslie Knox as the liquidator of the TCLF.

## MOTIONS OF NO RIGHT/CAUSE OF ACTION

As a preliminary matter, all parties filed exceptions in this appeal. Pias filed a Peremptory Exception of No Right of Action against the individual shareholders/directors of TCLF. He alleges that they have no right to appeal a judgment in favor of or against TCLF. He urges they cannot seek redress through appeal on behalf of the corporation as requested in their answers. In support of this contention Pias cites the first circuit case of *Dawson Engineers, Inc. v. Lemel Ironworks, Inc.*, 307 So.2d 771 (La.App. 1 Cir. 1975), claiming that the situation in the present matter is "factually identical" to the *Dawson* case.

*Dawson* is clearly distinguishable from the present matter. In that case Dawson Engineers, Inc. filed suit against Lemel Ironworks, Inc. for damages arising from Lemel's alleged refusal to permit Dawson Engineers to recover a plate roll machine left on Lemel's premises. Following a trial on the merits, judgment was rendered in favor of Lemel, dismissing Dawson Engineers' demands. Following the judgment, William J. Dawson, individually, moved for, and was granted, a suspensive appeal. No appeal was taken by Dawson Engineers, Inc. The first circuit held, on its own

4

motion, that there was a lack of valid appeal and a consequent lack of jurisdiction. The court stated: "It is basic that a suit can be brought only by one having a real interest in the subject matter thereof. [La.Code Civ.P. art. 681]. Appeals may be taken only by parties to the suit, their legal representatives, or by third persons who could have intervened in the trial court. [La.Code Civ.P. arts. 2082, 2086]." *Id.* at 772.

The key distinction between the *Dawson* case and the present matter is that Mr. Dawson was never a party to the suit, and therefore, lacked standing to appeal the trial court's judgment. In the instant case, Pias sought to join the individual shareholders as indispensable parties in this suit against him. He succeeded, and the trial court granted his request with respect to all individual shareholders except Delafield. Louisiana law is clear in its interpretation of La.Code Civ.P. art. 2082. Any party to a suit may appeal the judgment of the trial court. Pias joined the individual shareholders, and cannot now attempt to un-ring that bell and deny them, as parties to the suit, the ability to appeal the trial court's judgment. Accordingly, Pias' motion is denied.

The individual shareholders, as appellees and cross-appellants, filed Peremptory Exceptions of No Right of Action, No Cause of Action, Res Judicata, and Prescription. They claim that Pias has no right of action to seek the involuntary dissolution of TCLF and is not one of the persons authorized to request the appointment of a liquidator pursuant to La.R.S. 12:143(B). Additionally, they argue that Pias has failed to state a cause of action which would allow him to seek a money judgement against the individual shareholders for the debts of the corporation. Furthermore, if any such cause of action was stated, it would be barred by preemption as set forth in La.R.S. 12:92(D), and regardless, is res judicata as a result of an express release of such shareholders by Pias.

5

For the reasons we state below, we reverse the appointment of a liquidator to handle the dissolution of TCLF, and we affirm the judgment of the trial court denying Pias' requests for money judgment against the individual shareholders of TCLF. As Pias' request for money judgment against the individual shareholders is denied on other grounds, we will not address the issue of res judicata by an earlier express release of the shareholders by Pias.

## ASSIGNMENTS OF ERROR

Pias presents the following assignments of error for our review: did the trial court err in finding that TCLF could bring suit to enforce the Shareholders Agreement when it was not a party to the agreement; did the trial court err by allowing Plaintiff's Exhibit No. 2 into evidence and allowing Wadsack to testify as to its contents; and finally, did the trial court err in refusing to find the shareholders/directors of TCLF personally liable for the debt of the firm following the unlawful distribution of assets to themselves, which distribution renders the corporation insolvent.

The individual plaintiffs have not presented a single brief, but have grouped themselves and submitted a total of three briefs between them: a brief has been filed by Frohn, another has been filed by Thibodeaux, and one brief has been filed on behalf of Mize, Robichaux, and Wadsack collectively. Although the plaintiffs have presented a total of three separate briefs, the arguments within them are substantially similar and they raise essentially the same issues on appeal. For organizational simplicity we have consolidated their arguments and present them as issues raised by the plaintiffs/appellees collectively.

The plaintiffs present the following assignments of error: did the trial court err in making the factual determination that Pias was terminated, in light of the fact that

6

the legal requirements for such termination had not been established; did the trial court fail to properly interpret the Shareholders Agreement by altering the withdrawal formula and limiting Pias' lease obligation to the time period specified for early termination within the firm's business space lease with Premier Bank as well finding that TCLF had a duty to mitigate its damages in this situation; and finally, did the trial court err in appointing a liquidator at Pias' request to force the dissolution of TCLF.

## LAW AND ARGUMENT

**Pias' Assignments of Error**

*Assignment of Error #1*

In his first assignment of error, Pias claims that the trial court erred in ruling that TCLF had standing to bring suit against him to enforce the Shareholders Agreement when the firm was not a party to that agreement. Pias claims that TCLF was not a signatory to the written contract, and therefore, it cannot be bound. The plaintiffs counter that, pursuant to La.R.S. 12:809, a professional law corporation is bound by the terms of a shareholder agreement signed by all the voting shareholders. The trial court agreed with the plaintiffs, stating in its reasons for judgment:

> It is the contention that THE CARMOUCHE LAW FIRM is not the proper party to bring the action since it did not sign the Shareholder Agreement. The Employment Agreement and the Shareholder Agreement are intertwined. THE CARMOUCHE LAW FIRM is specifically mentioned and referred to a number of times as a corporation throughout the document. All parties to THE CARMOUCHE LAW FIRM signed the document as well as the individual Employment Agreement. Therefore, the Court finds no merit that THE CARMOUCHE LAW FIRM has no standing to bring this action.

We agree that there is no merit to this assignment by Pias, and we affirm this ruling by the trial court.

*Assignment of Error #2*

In his second assignment of error Pias claims that the trial court clearly erred

7

in granting any weight to Wadsack's testimony as to the calculation of the debt Pias allegedly owes to the firm, as well as in admitting plaintiff's exhibit number 2 into evidence, a letter to Pias accompanied by the summary of the amount he allegedly owes the firm pursuant to the withdrawal calculation contained in the Shareholders Agreement. Pias argues that it was error for the trial court to admit that summary as an accurate reflection of the values to use in the withdrawal calculation. He argues that, pursuant to the Louisiana Code of Evidence, the contents of otherwise admissible evidence may be admitted in the form of a chart, summary, or calculation only where the evidence supporting the summary is made available for examination. La.Code Evid. art. 1006. Furthermore, Pias draws our attention to author's note four of the La.Code Evid. art. 1006, which states that there are four foundational requirements which must be satisfied prior to the admission of such a summary. Those requirements are: (1) the underlying materials must be so voluminous that they cannot be conveniently examined in court, (2) it must be demonstrated that the underlying materials which are summarized are otherwise admissible into evidence, (3) advance notice and opportunity to examine the underlying evidence must be given to the opposing side, and (4) the summary must be authenticated.

Pias contends that the underlying materials used in preparing the document and providing the values used in the redemption equation were never made available for his examination, despite repeated requests both before and during the trial. Pias claims that Wadsack, who was the sole source of testimony supporting the document and who performed the calculation of the redemption equation, relied heavily on hearsay evidence in preparation of the summary. Therefore, Pias alleges that the document itself is hearsay not subject to any exception.

Pias urges that the insufficiency of the evidence used to support this summary

8

was made abundantly clear during trial. No documentation was provided to support the underlying first variable of the equation, the shareholder's capital percentage, or the value used as the average monthly net earnings, notes payable to shareholders, or accounts payable. Furthermore, Wadsack was unable to provide even basic information to support his values used, such as where, or from whom, he obtained these figures. Most striking, it was shown at trial that the figures presented in court testimony were different than the figures actually used in the calculation. Pias argues that the trial court erred in awarding any sum to TCLF under the terms of the contract as there was no competent evidence upon which it could base that award.

In our review of the trial record, and the testimony at trial, it is clear that the summary admitted as Plaintiff's Exhibit No. 2 suffers from a great many inadequacies and inconsistencies. An excerpt from the cross examination of Wadsack during trial reads as follows:

Q. Can you tell me how you arrived at the figure that you inserted into your spreadsheets?

A. Which are you talking about, the figure 43,786.35? Is that the figure that you're talking about?

Q. I'm talking about the figure that's next to the average monthly net earnings.

A. And that number is 43,786.35.

Q. Yes. How'd you arrive at that number?

A. I cannot tell you.

Q. You can't tell us?

A. Other than reading what's in the Shareholder's Agreement.

Q. Well, how do we know what numbers you relied on to arrive at that figure?

A. That was the number that was provided to me at the time the calculation

was run.

Q.    But you can't tell me how - - so you yourself did not calculate that?

A.    I did not calculate that number and I do not have - -

Q.    Any you don't have the person who calculated the number?

A.    I'm sorry, I - -

Q.    Whoever did calculate that number I'm assuming isn't here today?

A.    No.

Q.    So you can't testify as to what documents they relied upon to arrive at that number?

A.    No.

Q.    Nor can you tell me about what methodology they used to get there?

A.    That's correct.

Q.    Okay.  The next number you have on here is the First National Bank loan.  Where did you get that number from?

A.    It was off one of those sheets that was provided to you yesterday.  I've [sic]  believe it's sheet number four.

Q.    Do you have anything from the bank that verifies the figure on there?

A.    Asking me personally?

Q.    Yes.

A.    No, I do not.

Q.    Did you personally consult with the bank to verify the accuracy of that figure on December 6th?

A.    No, I did not.  Or at any other time.

The responses contained in this line of questioning are representative of the responses given by Wadsack upon questioning about the value used to represent the First National Bank Credit Line.  Additionally, the value used for shareholder notes on the spreadsheet, $20,656.58, is different than the value for that figure which

10

appears on the documents presented by the firm to support its calculation of the withdrawal equation, $14,982.56. On the stand Wadsack acknowledged this clear discrepancy. A similar discrepancy was shown during trial between the value for accounts payable found on the spreadsheet used to run the equation, $47,801.28, and the documentation provided at trial to support the information used to run the spreadsheet, $43,759.42.

We agree that the spreadsheet was not valid evidence, and does not stand for what it purports. Furthermore, these are not inconsistences that can be resolved without additional documentation from TCLF indicating the accurate value to be used for the variables in the withdrawal equation contained in the Shareholders Agreement. Accordingly, we find that any calculation of Pias' financial obligation to the firm based upon the information contained in this summary is inherently faulty and, therefore, inadmissable. We remand the matter of the accurate calculation of the withdrawal equation contained within the Shareholders Agreement to the trial court for recalculation following presentation of an adequately supported figured for use in that calculation.

*Assignment of Error #3*

In his final assignment of error, Pias claims the trial court erred in failing to find personal liability on the part of the individual defendants in reconvention. The trial court did not address Pias' claims against the individual defendants in reconvention in its reasons for judgment, or in the judgment itself. He notes that, when a trial court fails to address a claim placed before it, that claim is presumed to have been rejected by the trial court for purposes of appeal. *Big "D" Dirt Services, Inc. v. Westwood, Inc.*, 94-1234 (La.App. 3 Cir. 3/1/95), 653 So.2d 604.

Pias argues that Frohn, Thibodeaux, Robicheaux, Mize, and Wadsack entered

11

into an agreement on March 19, 1998, whereby they agreed to "wind up the affairs" of the corporation, and they transferred one-fifth of the cash collected by the firm for time and expenses owed to it through January 1, 1998, to each of them. The agreement indicates that the consideration for this disbursement was that they had not been paid their salaries for a number of months, and the five signatories had assumed five-sixths of the short term debt of the firm, and five-sevenths of the long term debt of the firm. Pias claims that, according to this agreement, these five individuals received cash from the firm totaling $402,053.73. Pias alleges that the sole purpose of this agreement was to dissolve the corporation, stripping it of assets and rendering the firm worth virtually nothing.

Pias relies heavily on the case of *Lopez v. TDI Services, Inc.*, 93-619 (La.App. 3 Cir. 2/2/94), 631 So.2d 679, *writ denied* 94-864 (La. 6/3/94), 637 So.2d 501. He notes that, in *Lopez*, this court found that the officers and directors of a corporation owe a fiduciary duty to the corporations creditors, and are under an obligation to see that the creditors are paid. We found the shareholder/director in that case personally liable to a creditor of the corporation for a debt owed. The creditor in *Lopez* was a former employee, and the debt was in the form of unpaid wages, penalties, and attorney fees. Pias argues that, just as is the case here, the shareholder/director had entered into a transaction with the corporation to repay a debt allegedly owed to him, with the effect of stripping the corporation of cash with which to pay the debt owed to the plaintiff. Pias argues that we found that this transaction by the defendant constituted a breach of his fiduciary duty as an officer and director of the corporation to the plaintiff who was a creditor. Pias urges that this same analysis applies in the instant matter, and the individual shareholder/directors of the firm should be held personally liable for the firm's debt to him.

12

The plaintiffs argue that *Lopez* is factually distinguishable from the present matter, and the holding in that case does not apply in this situation. They contend that any evidence presented at the trial court level to support a request to hold the plaintiffs personally liable for any debts of the firm is completely lacking and would not justify piercing the corporate veil in this matter.

As a general rule, corporations in Louisiana are distinct legal entities separate from the individuals comprising them. As a result, shareholders are not liable for the debts of the corporation except in very limited circumstances. Louisiana Revised Statute 12:93 provides in pertinent part:

> B. A shareholder of a corporation organized after January 1, 1929, shall not be liable personally for any debt or liability of the corporation.
>
> . . . .
>
> D. Every shareholder who receives any unlawful dividend or other unlawful distribution of assets shall be liable to the corporation, or to creditors of the corporation, or to both, in an amount not exceeding the amount so received by him. An action to enforce this liability must be brought within two years from the date on which the unlawful distribution was received, and this time limit shall not be subject to suspension on any ground, nor to interruption except by timely suit.

We find the plaintiffs are correct in their assertion that *Lopez* is factually distinguishable from the present matter. The events which led to our finding of personal liability for the corporation's debts in that case do not correspond with the actions of the plaintiffs in the present matter. In *Lopez* we held:

> The evidence clearly shows that Thomas DesOrmeaux has incorporated at least six different companies in less than ten years. Each new company was clearly formed in order to escape the liabilities and creditors of its predecessor. The business of each company exclusively involved the DesOrmeaux patented technology for waste disposal, the license for use for which was granted and withdrawn at the whim of the patentholders. The sole patentholder since June 1988 has been Thomas DesOrmeaux. There is no evidence that any of the companies was ever legally dissolved; they simply stopped doing business. Each successor corporation used the personnel and equipment of its predecessor. The

13

operational management of each corporation remained in the hands of Thomas DesOrmeaux.

Thermal Dynamics, Inc. and TDI Services, Inc. were grossly undercapitalized. The only capital contributed by the shareholders was $1 per share, for 1000 shares. All other financing for these companies, running to millions of dollars, came from outside investors, creditors who have, for the most part, not been fully repaid.

We see no policy reason not to hold Thomas DesOrmeaux personally liable for the judgment owed to Lopez by Thermal Dynamics. The purpose of limited liability, to encourage investments in high risk businesses by enabling investors who use the corporate form to make capital contributions while insulating their personal wealth from the business risks, is not served in this case. Thomas DesOrmeaux essentially risked nothing; his creditors risked all. The only asset of value to these corporations, the patent rights valued at $125,000,000, always remained in the ownership and control of the DesOrmeauxes and, since June 1988, of Thomas DesOrmeaux.

*Lopez*, 631 So.2d at 686.

The situation described above, which justified piercing the corporate veil in the *Lopez* case, does not exist here. We have not been provided with any conclusive evidence that the distribution of cash to the shareholders which resulted from the 1998 Shareholder Agreement was an illegal transaction or was conducted for the specific purpose of avoiding the debt obligations of the corporation, which would justify piercing the corporate veil under La.R.S. 12:93(D). There was evidence presented at trial that it was a regular occurrence for the shareholders to have to temporarily do without their monthly draws due to cash flow issues within the firm. Furthermore, there was no evidence presented by Pias to contradict the plaintiffs' contention that they had not been receiving their salaries for several months. Without more, we do not find adequate circumstances to justify piercing the corporation veil in this matter and impose liability on the individual shareholders/directors of the Carmouche Firm.

**Plaintiffs'/Appellees' Assignments of Error**

14

*Assignment of Error #1*

In their first assignment of error the plaintiffs note that the trial court's interpretation of the Employment Agreement turns on its determination that Pias was fired. They allege that, on Friday December 6, 1996, Pias informed the firm's corporate secretary that he quit the firm. Up until that day, they claim that there had been no discussions among the directors to fire Pias. They insist that there had been no meeting and vote to terminate Pias, and no action to terminate him was taken by any director. The plaintiffs argue that only the self-serving testimony of Pias himself contradicts their position.

The plaintiffs also argue that there is no legal basis for concluding that Pias was terminated. They state that La.R.S. 12:224 requires a vote for the termination of a director of a corporation. They insist that there was no evidence presented indicating the required meeting of shareholders and subsequent vote for termination of Pias and Delafield ever occurred. They further argue that this is not a case of apparent authority, as that doctrine cannot apply to someone with knowledge who cannot show a reasonable reliance on the apparent scope of an agent's authority. They insist that Pias, as an attorney, knew and understood his relationship to the rest of the directors and knew that Mize did not have the authority to fire him without the required vote by the firm's shareholders.

The plaintiffs also claim that the trial court mistakenly determined that Delafield was offered a continuing relationship with the firm while Pias was not, and that the trial court erroneously treated the rent sharing agreement with Delafield as being contemporaneous with Pias' departure. In addition, another basis for the trial court's determination that Pias was fired is the assertion that Pias did not receive any new assignments of files during the two months prior to his departure. They claim

15

that there was no testimony regarding the issue of how a director in the firm receives business, whether it is assigned or the director is expected to generate business.

The Employment Agreement signed by all of the shareholders of TCLF, including Pias, provides the following provisions for a shareholder's termination of employment with the firm:

> 8. <u>Termination of Employment</u>. Employer may terminated this Agreement without cause at any time (except during a period when Employee is totally disabled) upon thirty (30) days written notice to the Employee, and Employer shall only be obligated to continue to pay Employee a pro rata portion of Employee's Annual Salary (based on the number of months employed during the fiscal year) due him under this Agreement through the date of termination, plus thirty-five (35%) percent of Employee's Annual Salary for the immediately preceding fiscal year of Employer, payable over (6) equal monthly installments, which shall be in lieu of any claims Employee may have with respect to accounts generated by Employee while an employee hereunder. If Employee is terminated with cause, then he is not entitled to any compensation beyond his compensation through day of termination.
>
> . . . .
>
> Following any notice of termination of employment hereunder, whether given by Employer of Employee, Employee shall fully cooperate with Employer in all matters relating to the winding up of his pending work on behalf of the Employer and the orderly transfer of such work to the other professional employees of Employer.

The question of whether Pias was, in fact, fired by the firm, is one of fact and will not be set aside on appeal absent manifest error by the trial court. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Furthermore, where findings are based on evaluations of credibility of witnesses, the manifest error/clearly wrong standard of review requires great deference for the factfinder's conclusions. *Id.* In our review of the record we find no such manifest error in the determination of the trial court that Pias was fired by the firm.

In particular, we note that it seems clear that the trial court was persuaded by the testimony of Delafield, called as a witness by TCLF and not Pias. Delafield

16

supported Pias' position that they were told they would be terminated if they refused to sign the letter of apology, and that he felt that he had been fired. Despite this impression by Delafield, he stated that he refused to leave the firm unless he was physically removed by the other shareholders, and eventually his standing in the firm was clarified.

In its reasons for judgment, the trial court stated:

> Delafield who testified as a witness called by CARMOUCHE and was probably the only disinterested witness to testify, testified that he thought he was terminated in September of 1996 but that he refused to leave the firm and stayed on and rented space from the firm until he finally left in 1998. On December 6, 1996 PIAS notified the firm that he was leaving. Apparently, they did not offer him the same deal as Delafield to stay and rent space from them.

> PIAS and Delafield, they were certainly made to feel "unwelcome" in the firm by the action of the shareholders subsequent to the September "incident". PIAS handled no new files and only helped resolve existing files for the firm. He worked from October 1st to December 6th during the new fiscal year for the firm. PIAS was not offered a rental space in the building.

> . . . .

> The court believes that PIAS was terminated, Delafield who was in the same boat felt like he was terminated in September 1996. The firm treated PIAS like he was not longer a member of the firm because he was not assigned to any of the new files during the period after October 1, 1996/ Although he continued to work on the firms files, he was not treated as a member of the firm.

There is no reference within the Employment Agreement that a meeting and vote of the shareholders would be required to terminate employment. Following being told by the managing partner that they were going to be "out of the firm" if they refused to sign the letter, it was reasonable for Pias and Delafield to believe that they had been fired. Therefore, we similarly find no error on the part of the trial court in its determination that Pias' termination was without cause, entitling him to the recovery outlined in the Employment Agreement quoted above. We affirm the ruling

17

of the trial court that Pias was terminated, and that he was terminated without cause. Therefore we affirm the decision of the trial court that Pias is entitled to a payment of $25,546.50, representing thirty-five percent of his salary from the immediately preceding fiscal year.

*Assignment of Error #2*

In their next assignment of error, the plaintiffs argue that the intent of the parties as expressed in the 1996 Shareholders Agreement is clear. They argue that the agreement required that any parting attorney is responsible for certain obligations of the firm, including the lease obligation. The plaintiffs insist that the uncontroverted evidence presented at trial was that the total outstanding indebtedness of the corporation for the Premier Bank lease at the time of Pias' departure was $426,862.00.

The plaintiffs argue that the 1996 Shareholders Agreement did not specifically require that the firm exercise any early termination clause in the lease for the benefit of a departing director. They claim that, as a result of TCLF's prior experience of having to carry the lease and debt burden of the form after the departure of lawyers, their primary concern in establishing their current lease with Premier Bank was to prevent the possibility of another similar situation. The plaintiffs insist that the relevant clause in the Shareholders Agreement is clear and unambiguous and the trial court should not have looked beyond the four corners of the document to determine the meaning of the provision. *Cashio v. Shoriak*, 481 So.2d 1013 (La.1986). They contend that the phrase "total outstanding indebtedness" of the corporation on the business space lease found in the withdrawal formula is not subject to further interpretation or dispute.

Pias contends that the plaintiffs' argument incorrectly assumes that there is only one definition of "total outstanding debt of the corporation on the ... [b]usiness space

18

lease." Pias counters that the total outstanding debt of the firm with respect to the lease would be how much it would owe on the date of the director's termination. He insists that amount would be the amount prescribed by the early termination clause in the lease, the most the corporation was obligated to pay under the Premier Bank lease on the date of Pias' departure, found by the trial court to be $85,408.80.

The business space lease entered into by TCLF with Premier Bank contains the following provision for early termination of the lease:

> **12.1 Early termination**. Provided that no Event of Deafult is then in existence, Tenant, upon giving Landlord 90 days' prior written notice, shall have the right to terminate this Lease in its entirety and to vacate the Leased Premises upon payment by Tenant to Landlord of a termination penalty equal to the sum of two month's Base Rental plus the then existing Unamortized Amount.

The extent of the obligation to pay out the Building Space Lease with Premier Bank is not defined to specifically include the full five year term of the lease. We find it is clear that the intent of the shareholders in negotiating this current lease and drafting the 1996 Shareholders Agreement was to prevent the possibility of their being legally obligated to continue rental payments on a lease space they can no longer afford. However, this eventuality was effectively eliminated though the negotiation of their lease with Premier Bank, which contained the early termination clause. The only remaining obligation from which they needed to protect themselves via the 1996 Shareholders Agreement was the fulfillment of the remaining financial obligation in the event they must exercise the early termination clause of their business space lease. Any further protection was offered by the lease itself.

We agree with the trial court that the only mandatory obligation on the lease that the firm could be held accountable for in the event of an inability to continue paying on their lease is early termination clause contained in the lease agreement.

This provision within the lease provides the Corporation with its desired protection for the risk of having to fulfill a long term and overly burdensome financial obligation. The only protection required by the subsequent shareholder's agreement is coverage for payments sufficient to satisfy the early termination conditions within the lease. The firms decision to stay in the business space despite the loss of a portion of the funds supporting rent payments is not one that Pias is required to financially support.

This is particularly true in these circumstances, where Pias repeatedly offered to remain in the office space and continue to pay on his portion of the lease obligation and the shareholders refused any attempt to reduce the financial burden they were apparently so concerned about. That they chose to deny this very reasonable request from Pias, a request which was later granted to Delafield, indicates to us that they were not overly burdened by the financial impact of Pias' termination. Where the term of the equation is not specifically defined to include the full remaining term of the lease, and the early termination clause exists within the lease agreement, we refuse to extend Pias' financial obligation over the entire remaining term of the lease. We affirm the ruling of the trial court holding that Pias' only obligation for the as to the building space lease is to fulfill the financial obligation that would be incurred upon the firm if it enacted the early termination clause of the lease agreement at the time of his termination.

*Assignment of Error #3*

In their final assignment of error, the plaintiffs claim the trial court erred in appointing a liquidator to force dissolution of TCLF at Pias' request. The plaintiffs argues that the statute regarding the involuntary liquidation of a professional law corporation is clear, and Pias does not fit within any of the categories of individuals

entitled to bring such an action. Louisiana Revised Statute 12:143 states in pertinent part

> B. An involuntary proceeding for dissolution may be instituted against a corporation by either:
> (1) A shareholder or shareholders, severally or jointly, who have been registered owners, for a period of not less than six months, of not less than twenty per cent of the entire outstanding shares of the corporation; or
> (2) A majority of the corporation's directors; or
> (3) A creditor whose claim has been reduced to judgment, on which execution has been issued and returned "nulla bona"; or
> (4) A receiver appointed under R.S. 12:151 to take charge of the corporation's property.

The plaintiffs contend that the statute is clear. Pias does not hold, and has never held, at least twenty percent of the entire outstanding shares of the corporation and he is not a receiver appointed to take charge of the corporation's property. Furthermore, even if Pias is deemed to be a creditor under the terms of the statute, it must first be established that the corporation is actually insolvent before a creditor can force liquidation of the corporation. They stress that Louisiana courts have consistently held that the involuntary liquidation of a corporation is reluctantly applied and the grounds for such a liquidation are limited and specific. *LaFleur v. Guillbeau*, 617 So.2d 1362 (La.App. 3 Cir. 1993). They insist that Pias is not authorized to bring an action to dissolve the corporation or request the appointment of a liquidator.

We find the trial court abused its discretion in appointing a liquidator at the request of Pias. The plaintiffs are correct in their assertion that Pias does not meet any of the criteria of an individual authorized to bring an action to force liquidation of the corporation under La.R.S. 12:143. Prior to instituting such an action Pias must be in possession of a judgment, and he must attempt to execute that judgment and have it returned *nulla bona* to establish that the corporation is, in fact, insolvent. That has not yet been established in this case. A forced liquidation of the corporation in this matter

21

is premature.  The ruling of the trial court appointing a liquidator is reversed.

**DECREE**

The judgement of the trial court holding that TCLF has standing to bring suit to enforce the terms of the Shareholders Agreement is affirmed, as is its refusal to find the shareholders personally liable for the debts of the firm following the distribution of assets in the January 1998 agreement.  The trial court abused its discretion in admitting Plaintiff's Exhibit No. 2 into evidence, as there was no foundation laid that the figures used to calculate the withdrawal equation contained in the 1996 Shareholders Agreement were correct.  The matter of the values to be used in calculation of the withdrawal equation is remanded to the trial court and values consistent with this opinion as to appropriate lease obligation shall be used in the withdrawal formula calculation to determine Pias' financial obligation to TCLF.  We affirm the trial court's conclusion that Pias was terminated without cause and that he is entitled to thirty-five percent of he salary during the fiscal year immediately preceding his date of withdrawal from the firm, or $25,546.50, as well as $12,688.00 in unpaid wages for work he performed for the firm between October 1, 1996 and December 6, 1996.  Finally, we reverse the trial court's ruling appointing a liquidator as requested by Pias.  All costs of this appeal are cast against TCLF.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

22